**ZAMORA RADIO, LLC, Plaintiff,**

v.

**LAST.FM, LTD., CBS Radio Inc., CBS Corp., Slacker, Inc., Pandora Media, Inc., Rhapsody America LLC, Realnetworks, Inc., Dkcm, Inc., Soundpedia, Inc., AOL, LLC, Accuradio, LLC, and Yahoo! INC., Defendants.**

**Case No. 09–20940–CIV.**

United States District Court,
S.D. Florida.

Nov. 5, 2010.

---

Alejandro Alvarez, Phillip Edward Holden, The Alvarez Law Firm, Coral Gables, FL, John F. Ward, David M. Hill, Michael G. Gabriel, Ward & Olivo, New York, NY, Annette Cristina Escobar, Chalon Tamara Allen, Edward Maurice Mullins, Astigarraga Davis Mullins & Grossman, Miami, FL, for Plaintiff.

Andrew S. Brown, Weil Gotshal & Manges, Mark D. Baker, Tigran Vardanian, Quinn Emanuel Urquhart Oliver & Hedges, New York, NY, Annette Cristina Escobar, Edward Maurice Mullins, Chalon Tamara Allen, Astigarraga Davis Mullins & Grossman, Edward Soto, Robert S. Berezin, Weil Gotshal & Manges, Bruce Judson Berman, Carlton Fields, Samuel M. Sheldon, McDermott Will & Emery LLP, Stanley Howard Wakshlag, Kenny Nachwalter, P.A., Paul Joseph Schwiep, Coffey Burlington, Miami, FL, Edward R. Reines, Stefani C. Smith, Weil Gotshal & Manges LLP, Redwood Shores, CA, J. Pieter Van Es, Matthew P. Becker, Richard S. Stockton, Thomas J. Lerdal, Banner & Witcoff, Chicago, IL, Charles K. Verhoeven, Jennifer A. Kash, Linda J. Brewer, Richard H. Doss, Quinn Emanuel Urquhart & Sullivan, LLP, San Francisco, CA, for Defendants.

### ORDER ON DEFENDANTS REALNETWORKS, INC. AND RHAPSODY AMERICA LLC'S MOTION FOR SUMMARY JUDGMENT OF NON–INFRINGEMENT

EDWIN G. TORRES, United States Magistrate Judge.

This matter is before the Court upon Defendants Realnetworks, Inc. and Rhapsody America LLC's ("Defendants" or "Rhapsody") Motion for Summary Judgment of Non–Infringement [177]. Previously, the Court issued the Claim Construction Order in this case on March 9, 2010 [D.E. 170]. We have reviewed the motion, the response, and the record in the

case. For the following reasons, the motion is granted.

## I. BACKGROUND

This is a patent infringement action concerning a U.S. Patent No. 6,349,339 ("the '399 Patent") owned by Plaintiff Zamora Radio, LLC ("Zamora"). Issued on February 19, 2002, the '399 Patent concerns a streaming media system technology commonly referred to as "internet radio." Defendants in this case are "internet radio" service providers who allow their customers to stream music and other web-based services to customers' personal computers, mobile phones or other compatible electronic devices. Users of Defendants' services in question do not have any ownership rights to the music or other data that Defendants stream for playback. Thus, users cannot rewind or replay the streamed data. They can, however, pause or skip the currently played song or audio segment.

On April 10, 2009, Zamora brought this patent infringement action claiming that Defendants' products and services utilize the systems and methods disclosed and claimed in its '399 Patent. Defendants answered the Complaint and filed counterclaims for non-infringement and invalidity.

The patent-in-suit, titled "System and Method for Utilizing Data Packets" sets forth 43 claims. Generally speaking, the '399 Patent relates to a system and method for providing a predetermined group of data packets to a user who may utilize (e.g. review, listen, watch, read, etc.) such data packets with a user computing arrangement "UCA." *See* '399 Patent 1:44–55 [D.E. 1 Ex. 1]. The UCA then executes a set of instructions to utilize the data packets in the predetermined order, whereby the user is allowed to skip ahead to the next data packet in the predetermined order but is prevented from modifying that order or replaying a utilized data packet. *Id.*

Two of the Defendants, Realnetworks, Inc. and Rhapsody America LLC, now move for summary judgment that their radio internet products do not infringe any of the asserted claims of the '399 Patent. Zamora opposes Defendants' motion arguing that: 1) the motion should be denied as moot in view of Plaintiff's acknowledgment of non-infringement on certain one limitation; 2) the motion should also be denied because all discovery relevant to Defendants' motion was not completed by agreement of the parties; 3) existence of genuine issues of material fact preclude summary judgment of non-infringement at this stage; and 4) Plaintiff may prove infringement by equivalents at trial.

## II. STANDARD OF REVIEW

### A. *Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden is met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*

v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, the non-moving party "may not rest upon the mere allegations or denials of his pleadings, but ... must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In determining whether a genuine issue of material fact exists, the court must not make credibility determinations or weigh conflicting evidence. *Id.* at 255, 106 S.Ct. 2505. Rather, the court must view the evidence in the light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor. *Id.* (internal citation omitted); *see Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1365 (Fed.Cir.2008) (internal citation omitted). The Federal Circuit has held that "summary judgment is as appropriate in patent case as in any other ...." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir. 1984).

## B. *Patent Infringement Analysis*

A patent infringement analysis involves two steps: claim construction and then the application of the construed claim to the accused process or product. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The first step, claim construction, has been held to be purely a matter of law. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed.Cir.1998) (en banc). The second step, application of the claim to the accused product, is a fact-specific inquiry. *See Kustom Signals, Inc. v. Applied Concepts, Inc.*, 264 F.3d 1326, 1332 (Fed.Cir.2001) (Patent infringement, "whether literal or under the doctrine of equivalents, is a question of fact."). Summary judgment, therefore, is appropriate in patent infringement suits when it is apparent that only one conclusion regarding infringement could be reached by a reasonable jury. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001).

## C. *Burden of Proof*

The patentee asserting infringement bears the burden of proof by a preponderance of the evidence. Indeed, the Federal Circuit expressly stated that the "patent owner has always borne the burden of proving infringement." *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 685 (Fed.Cir.1990). Thus, "[s]ince the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of non-infringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1046 (Fed.Cir.2001).

"[O]n issues in which the nonmovant bears the burden of proof, in contrast to those in which the movant bears the burden, the movant need not 'produce evidence' showing the absence of a genuine issue of material fact in order to properly support its summary judgment motion." *Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307 (Fed.Cir.2006) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548). In other words, "nothing more is required than the filing of a summary judgment motion stating that the patentee had no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Id.* at 1309. Once the movant has satisfied its initial burden, the "burden of production then shift[s] to [the non-movant] to identify genuine issue that preclude

summary judgment." *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, 469 F.3d 978, 990 (Fed.Cir.2006).

## D. Infringement

### 1. Direct Infringement

A patentee may sue for direct infringement under 35 U.S.C. § 271(a):

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States, or imports into the United States any patented invention during the term of the patent therefore, infringes the patent.

The "making, using, or selling of a patented invention is the usual meaning of the expression 'direct infringement.'" *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed.Cir.1993).

█ Using the properly construed claims as a guide, the trier of fact must determine whether every claim limitation or its equivalent is found in the accused device or process. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). "To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed.Cir.1995); *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed.Cir.1994) ("For literal infringement, each limitation of the claim must be met by the accused device exactly, any deviation from the claim precluding a finding of infringement."). Accordingly, a claim cannot be literally infringed if any claim element or limitation is missing entirely from the accused product. *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1539 (Fed.Cir.1991). However, "the addition of features does not avoid infringement, if all the elements of the patent claims have been adopted. Nor is infringement avoided if a claimed feature performs not only as shown in the patent, but also performs an additional function." *N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 945 (Fed.Cir.1990) (citation omitted).

█ In contrast to literal infringement, which requires that the accused device precisely embody every limitation in the claim, the "doctrine of equivalents allows the patentee to claim those insubstantial alternations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Felix v. Am. Honda Motor Co., Inc.*, 562 F.3d 1167, 1181 (Fed.Cir.2009) (internal citation omitted). An "[i]nfringement analysis under the doctrine of equivalents proceeds element-by-element; a generalized showing of equivalency between the claim as a whole and the allegedly infringing product or process is not sufficient to show infringement." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1286 (Fed.Cir.2009) (internal citation omitted). "The primary test for equivalency is the ... 'triple identity' test, whereby the patentee may show an equivalen[ce] when the accused product or process performs substantially the same function, in substantially the same way, to achieve substantially the same result, as disclosed in the claim." *Id.*

### 2. Indirect Infringement

█ Liability under Section 271(b) arises when a defendant "actively induces infringement of a patent." Induced infringement is found where a person actively and knowingly aids and abets another's direct infringement. *Water Techs. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed.Cir. 1988) ("Although section 271(b) does not use the word 'knowing,' the case law and legislative history uniformly assert such a requirement."). In order to establish a claim for induced infringement, the paten-

**1248**

tee must show that: (1) there has been direct infringement; (2) the alleged infringer knowingly induced infringement; and (3) the alleged infringer possessed specific intent to encourage another's infringement. *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1378 (Fed.Cir.2005). A party may be found liable for induced infringement when it sells a product and provides instructions on how to use it in an infringing manner. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1360 (Fed.Cir.2006); *see also Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936, 125 S.Ct. 2764, 162 L.Ed.2d 781 (2005) ("[I]nstructing how to engage in an infringing use, show[s] an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use.").

■ A defendant is liable for contributory infringement if it:

offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

35 U.S.C. § 271(c). After sorting through the statutory language, Section 271(c) es-

sentially instructs us that a party who sells a product that can be used for only one purpose must be liable for contributory infringement. *See Metro–Goldwyn–Mayer Studios*, 545 U.S. at 932, 125 S.Ct. 2764 ("[W]here an article is 'good for nothing' but infringement, there is no legitimate public interest in its unlicensed availability, and there is no injustice in presuming or imputing an intent to infringe.").

Because direct infringement is a necessary element under both Section 271(b) induced infringement and Section 271(c) contributory infringement, courts usually start the analysis by addressing that element of both claims.

## III. ANALYSIS

### A. *Defendants' Motion is not Moot*

Following this Court's entry of the Claim Construction Order [D.E. 170] on March 9, 2010, Zamora filed its Motion for Entry of Consent Judgment [D.E. 175] contending that, under the adopted claim construction, Defendants' accused products do not infringe on the '399 Patent citing to only one claim limitation.[1] Defendants, however, jointly opposed Plaintiff's motion. [D.E. 176]. They argued that, in addition to the issue on which Plaintiff consented to non-infringement, Defendants are entitled to a judgment as a matter of law of non-infringement on additional grounds. Subsequently, we denied Plaintiff's motion after concluding that "there was obviously no consent from Defendants" for the entry of Zamora's proposed judgment. [D.E. 209].

---

1. In our Claim Construction Order we found that the claim term "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" means "setting the order of data packets by the software application on the user computer, based on the rules, and then utiliz-

ing the data packets with that order." Based on this finding, Plaintiff consented that because Defendants' accused systems set the order of the data packets by a software application on the Defendants' servers, these systems do not infringe on the '399 patent.

█ Plaintiff now essentially renews its argument that its concession of non-infringement on one claim limitation moots out any possible remaining basis on which summary judgment may be granted in Defendants' favor. We, however, disagree.

Pursuant to 28 U.S.C. § 1295(a)(1), the Federal Circuit has appellate jurisdiction "from a final decision of a district court." "[A] decision is not final, ordinarily, unless it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *Cunningham v. Hamilton Co., Ohio,* 527 U.S. 198, 204, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999). Thus, "final judgment in a patent case will usually produce a judgment of infringement or non-infringement." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.,* 442 F.3d 1322, 1326 (Fed.Cir.2006).

Plaintiff is technically correct that an entry of a consent judgment of non-infringement based on only one claim limitation produces an appealable "final" order that grants the Federal Circuit appellate jurisdiction. *See, e.g., Mass. Inst. of Tech. v. Abacus Software,* 462 F.3d 1344, 1350–51 (Fed.Cir.2006) (Federal Circuit has jurisdiction to review parties' stipulated entry of final judgment of non-infringement). Here, however, contrary to Plaintiff's assertion, Defendants have not consented to an entry of a judgment that rests only on one claim limitation. Instead, Defendants seek to obtain summary judgment of non-infringement on additional grounds. Absent an agreement with Defendants, Plaintiff does not get to pick and choose the grounds on which final judgment of non-infringement will rest on. Instead, we agree with Defendants that the appeal of this Court's final judgment should proceed on a fully developed record after consideration of all non-infringement grounds in a properly supported motion for summary judgment.

Furthermore, the Federal Circuit has "criticized trial courts for not providing facts in the record that would assist [appellate court's] ability to determine whether a particular claim term plays a determinative role in infringement or invalidity." *Toshiba Corp. v. Juniper Networks, Inc.,* 248 Fed.Appx. 170, 172 (Fed.Cir.2007) ("Toshiba's stipulation of noninfringement in this case provided no facts regarding how the district court's construction affects the infringement analysis"); *Mass. Inst. of Tech.,* 462 F.3d at 1350–51 (describing an appeal based on bare stipulated concession of non-infringement to be "highly undesirable").

**B. *Lack of Discovery Argument has no Merit***

Next, Zamora argues that Defendants' motion should be denied because *all* discovery relevant to this summary judgment motion has not yet been completed. It contends that following our entry of the Claim Construction Order, the parties have stipulated to stay all further discovery in view of Plaintiff's acknowledgment that the Defendants' accused products could not infringe the '399 Patent under the current claim construction. Defendants, on the other hand, claim that there has never been any stipulation to stay discovery and that they have complied with all discovery requests served on them.

This case was filed on April 9, 2009. Pursuant to this Court's Amended Scheduling Order, the discovery deadline passed on March 26, 2010 [D.E. 169]. Considering the fact that our Claim Construction Order was issued on March 9, 2010, Zamora essentially concedes that it conducted no relevant and material discovery for the eleven-month time frame following the commencement of this action. It does not offer an explanation, however, why it did

not bother to actively pursue discovery from Defendants during that time. We do not see how Zamora planned on litigating this action in the event we adopted its version of the claim construction. Naturally, instead of consenting to judgment of "non-infringement" and allegedly "staying" discovery, Zamora apparently planned to pursue all relevant discovery from multiple independent Defendants on a highly complex patent issue in roughly two weeks. We are not convinced by the logic in Plaintiff's argument regarding its lack of discovery.

Instead, Defendants have proffered that they have completed all of their document production and substantively responded to Plaintiff's discovery requests well before the close of discovery. They further represent that Defendants offered to produce a Rule 30(b)(6) witness in mid-March, but Zamora never followed up to schedule the deposition prior to the discovery deadline. It is clear to the Court that any "prejudice" that Plaintiff now faces at the summary judgment stage due to the insufficient amount of necessary discovery can only be attributed to Zamora's own doing.

### C. *Non–Infringement*

#### 1. *Asserted Claims and Claim Construction*

Before addressing the merits of Defendants' Motion for Summary Judgment, the Court reviews the claims and the Court's construction. As previously noted, the patent-in-suit, titled "System and Method for Utilizing Data Packets," sets forth 43 claims. The '399 Patent relates to a system and method for providing a predetermined group of data packets to a user who may utilize (e.g. review, listen, watch, read, etc.) such data packets with a user computing arrangement "UCA." *See* '399 Patent 1:44–55. The UCA then executes a set of instructions to utilize the data packets in the predetermined order, whereby the

user is allowed to skip ahead to the next data packet in the predetermined order but is prevented from modifying that order or replaying a utilized data packet. *Id.*

Of the 43 claims, Claims 1, 21, 26–27, 29–35, 39–40, and 43 are independent claims. The parties disputed the meaning of ten terms. Nine of the terms, emphasized below, are found in representative Claim 1 which identifies all the limitations that are at issue in Defendants' motion. The term "limited access" is found in Claim 7:

1. A method, comprising the steps of: providing *"data packets"* from a server arrangement to a user computing arrangement; determining, using at least one of the server and the user computing arrangement, *"rules"* governing *"utilization"* of the data packets by the user computing arrangement and *"preventing"* a user from altering the rules; *"storing"* the data packets on a storage device of the user computing arrangement; and with the user computing arrangement, *"executing a set of instructions"* which utilize the data packets in a *"predetermined order"* *"in accord with the rules,"* wherein the user of the user computing arrangement is prevented from *"modifying"* the predetermined order.

. . .

7. The method according to claim 6, further comprising the steps of: providing a *"limited access"* to the utilized data packets; and enabling the user to purchase at least one packet of the utilized data packets.

*See* '399 Patent 7:34–48, 8:16–20.

In our March 9, 2010 Claim Construction Order, we construed the disputed terms in the following manner: The term "data packets" was construed to mean "a group of at least two complete content items (e.g., audio, video, advertisements, or

the like)." *See* Claim Construction Order at 8 [D.E. 170]. The term "rules governing utilization" was construed to mean "criteria that define the selecting, grouping, and using." *Id.* at 12. "Storing" was construed to mean "retaining for instantaneous or later use." *Id.* at 13. The term phrase "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" was construed as "setting the order of the data packets by the software application on the user computer, based on the rules, and then utilizing the data packets with that order." *Id.* at 17. Finally, the parties have stipulated to the meaning of terms "preventing," "modifying," and "limited access." *Id.* at 12, 18.

### 2. Accused Services

The following facts about Defendants' products and services are undisputed.[2] Rhapsody is an online digital music service that provides users access to music on-demand services as well as professionally programmed radio stations. *See* Defs.' Statement of Facts ¶ 20 [D. 179]. Rhapsody provides both services free of charge. *Id.* Rhapsody 25 is a free services accessible via the Rhapsody Radio web browser and Rhapsody PC client. *Id.* ¶ 21. With Rhapsody 25, a user may browse the Rhapsody music catalog, listen to preset radio stations, and play on-demand twenty-five free songs per month. *Id.* The user is not required to establish an account to use Rhapsody 25, except when accessing it via the Rhapsody PC client. *Id.*

A subscription service called Rhapsody Radio provides essentially the same functionality and is accessible via the same products as the Rhapsody 25 account. *Id.* ¶ 22.

Rhapsody Unlimited is a subscription service that provides all the benefits of the free Rhapsody 25 service, but also permits a user unlimited on-demand access to the entire Rhapsody music catalog. *Id.* ¶ 23. It is accessible via the Rhapsody Radio web browser, PC Client, and home audio device products. *Id.* Rhapsody Unlimited has been recently renamed to Rhapsody Premier. *Id.*

Rhapsody–To–Go is another subscription service that provides users with benefits of a Rhapsody Unlimited account, including the unlimited on-demand access to the Rhapsody catalog, and also permits subscribers to access the service through portable devices such as mobile phones and MP3 players. *Id.* ¶ 24. Rhapsody–To–Go was recently renamed and is currently known as Rhapsody Premier Plus. *Id.*

RadioPass is a subscription internet radio service accessible via Realnetworks' RealPlayer software. *Id.* ¶ 25.

### 3. Accused Products

#### a. Rhapsody Radio Web Browser

The Rhapsody Radio web browser is accessed through http://www.rhapsody.com. *Id.* ¶ 27. From Rhapsody.com a user utilizing Rhapsody 25, Rhapsody Radio, Rhapsody Unlimited or Rhapsody–To–Go may access several preset radio stations. *Id.* Users with subscriptions may also access artist-based radio stations on web pages specific to particular artists. *Id.* When a user selects a radio stations to play, the user's web browser opens the Rhapsody Radio web browser interface/media player window, that currently uses the functionality of the Adobe Flash Streaming Player. *Id.*

---

**2.** Although we cite to Defendants' Statement of Facts hereafter, which are largely uncontested by Plaintiff, Defendants present their non-infringement case through: 1) declaration of Darryl Wood, the Senior Director of Music Services at Rhapsody International Inc.; 2) Rebuttal Expert Report of Doctor Kevin C. Almeroth; and 3) declaration of Mark D. Baker, counsel for Defendants.

When a user selects a radio station to play, the Adobe Flash Streaming Player communicates the user's choice to the Rhapsody server. *Id.* ¶ 28. The Rhapsody Radio web browser authenticates the Flash Player, which then requests that the server identify the first song to play for the selected station. *Id.* Thereafter, the server sends the identity of the first track to the Flash Player, which then makes a call to retrieve the URL location of the song identified by the server. *Id.* The Rhapsody server transmits the URL to the Player, at which point the Player makes a request to media servers maintained by Limelight Networks to begin streaming the song to the user. *Id.*

As each song finishes, the Player requests the identity of the next track from the Rhapsody server, the server then identifies the specific track to play, and the above process repeats. *Id.* ¶ 29. The titles of the songs that have played or that were skipped are displayed in the player window, and the play history is stored on the server. *Id.* At no time, however, during radio playback in the Rhapsody Radio web browser is a full copy of a complete song present on the user's computer. *Id.* ¶ 30. Rather, audio data is streamed in as-needed, is played to the user, and is deleted after it is played. *Id.* In the Rhapsody Radio web browser, the user's computer passively plays the song file that is sent by the Rhapsody server. *Id.*

The Rhapsody Radio web browser utilizes an algorithm to select which artists and specific songs to play. *Id.* ¶ 31. When it is time to select the next song, the Rhapsody server dynamically determines the next song to play based on inputs from the editor of the station (for genre stations), or other editorial data—such as similar artists—for custom and artists stations, applicable copyright regulations, and Rhapsody's more rigorous internal "Quality of Service" rules. *Id.*

Finally, the Rhapsody Radio web browser permits the user to replay on-demand songs already played on a radio station. *Id.* ¶ 32. For example, a user can click on a song in a radio station, and Rhapsody will display that artist's Artist Page, which contains a list of songs by the artist. *Id.* The user can then select and replay the song that was previously played in the ratio station. *Id.* For the Rhapsody 25 and Rhapsody Radio accounts, the Rhapsody Radio web browser permits a user to replay a song in this manner at least twenty-five times per month. *Id.* Rhapsody Unlimited or To–Go subscribers may replay already played songs as many times as they want. *Id.*

### b. *Rhapsody PC Client*

The Rhapsody PC client consists of software that is installed and operated on a user's computer. *Id.* ¶ 33. It delivers songs to a user using a different method than the Rhapsody Radio web browser. *Id.* Instead of the Adobe Flash Streaming Player, the Rhapsody PC client delivers an audio file to a user via "RAD/EA." *Id.* In this system, the RAD ("residual audio data") and EA ("essential audio") are separate files that are each encrypted and unrecognizable as audio data. *Id.* When a Rhapsody PC client plays a song, the RAD file is combined with the EA file into an audio file that can be played by the Rhapsody PC client. *Id.*

The larger file, the RAD file, contains most, but not all, of the audio data, and is downloaded, encrypted, and stored on the user's hard drive during the initial playback of the song. *Id.* ¶ 34. The remaining portion of the song, the EA file, is streamed to the user in 30–second segments during playback. *Id.* As the PC client nears the end of the 30–second segment, it sends a call to the server for the EA file to play the next 30 seconds. *Id.*

Neither the EA nor the 30–second increments of audio data is stored or cached on the user's computer. *Id.* ¶ 35. Once an EA file is utilized, it along with the audio data are immediately discarded from the user's computer. *Id.* As such, only enough of an EA file is ever present on the client machine to play 30 seconds of audio data. *Id.* Therefore, an audio file for a complete song is never present on the user's computer. *Id.*

With the exception of the method by which it streams music to the user, the PC client operates in largely the same way as the Rhapsody Radio web browser. *Id.* ¶ 36. Similarly to the web browser, the server selects the songs. *Id.* Once the Rhapsody server identifies the next song, it sends the user the RAD files for that song as well as the EA file to play the first 30 seconds. *Id.* When playback of a song begins, the server dynamically identifies the next artist to be played. *Id.* It is not until the first song draws to an end that the server identifies what particular song will play next. *Id.*

### c. Rhapsody–Enabled Home Audio Devices

Rhapsody-enabled home audio devices operate in a similar manner to the Rhapsody PC client. *Id.* ¶ 39. The home audio devices use RAD/EA files to deliver songs, the EA is streamed in 30–second segments on an as-needed basis and each segment is discarded after use such that there is never a full copy of any song on the user's client. *Id.*

### d. Rhapsody–Enabled Mobile Phones and MP3 Players

Radio stations on Rhapsody-enabled mobile phones operate in a similar manner to those on the Rhapsody Radio web browser. *Id.* ¶ 40. The server selects each song to play and transmits the song to the mobile phone. *Id.* Rhapsody-enabled mobile phones and MP3 Players permit, and

often require, users to subscribe to the Rhapsody–To–Go services. *Id.*

### e. RealPlayer and RadioPass

RadioPass is a subscription based Internet radio service for use with the RealPlayer. *Id.* ¶ 42. RadioPass operates in largely the same way as the Rhapsody Radio web browser. *Id.* ¶ 43. Like the web browser, songs are streamed to the user, one at a time, upon commencement of radio playback. *Id.* The songs are not delivered to the user beforehand, nor are complete songs stored on the user's computer. *Id.* The server determines the next song to play. *Id.*

A RadioPass user is permitted both to rewind a currently playing song and to replay an already played song. *Id.* ¶ 44. The user may not, however, fast-forward or skip the currently playing song. *Id.*

### 4. The Accused Products and Services do not Literally Infringe the Asserted Claims of the '339 Patent

#### a. The Accused Products do not set the Order of the Data Packets at the User Computer (All Asserted Claims).

■ Zamora consented that there is no infringement because the Accused Rhapsody Products and Services do not "execut[e] a set of instructions which utilize the data packets in a predetermined order in accord with the rules," which per our construction means "setting the order of the data packets by the software application on the user computer, based on the rules, and then utilizing the data packets with that order." In the accused products and services, songs for radio stations are not selected by software on the user's computer. Instead, the server selects the songs for radio stations and then sends them one at a time to the user computer for play. *See* Defs.' Statement of Facts ¶¶ 28, 31, 36, 39–40, 43. Because all asserted claims include this

limitation, Defendants are entitled to summary judgment of no infringement on this ground.

### b. The Accused Products and Services do not Create a Predetermined Order of Data Packets (All Claims)

The asserted claims require that the data packets be set in a "predetermined order" before they are played. *See, e.g.*, '399 Patent, Claim 1, 7:44–46 ("with user computing arrangement, executing a set of instructions which utilize the data packets in a predetermined order").

We previously construed the term phrase: "executing a set of instructions which utilize the data packets in a predetermined order in accord with the rules" to mean "setting the order of the data packets by the software application on the user computer, based on the rules, and then utilizing the data packets with that order." Although the term "predetermined order" has not been explicitly construed, our construction of the executing limitation requires that the software on the user's computer set the order of the data packets "and then utiliz[e] the data packets in that order."

Here, there is no dispute that the Accused Rhapsody Products do not determine a predetermined order of songs for a radio station. When a user clicks on a radio station, the first song is sent in segments from the server to a user's computer, and the segments are each played and then discarded after playback. After the first song begins to play, the next song is not determined by the Rhapsody server until the first song is over or nearly over. *See* Defs.' Statement of Facts ¶¶ 29, 34, 36, 39–40, 43. Thus, the Accused Rhapsody Products do not create a "predetermined order" of "data packets" (i.e., groups of at least two complete songs). Accordingly, Defendants are entitled to summary judgment of no infringement on this basis.

### c. The Accused Products and Services do not Prevent the User from Modifying the Order of the Data Packets (All Claims)

It is undisputed that Rhapsody permits listeners of radio station to modify the predetermined order by replaying songs from a radio station on-demand. *Id.* ¶¶ 32, 38–41. This on-demand feature is included in the free and subscription services of Rhapsody. Similarly, there is no dispute that the RadioPass buffer permits a user to rewind and replay songs that have already been heard in the radio station, thereby modifying the order of songs. *Id.* ¶ 44.

Therefore, we conclude that Defendants are entitled to summary judgment of non-infringement for this reason as well because their accused products do not prevent a user from modifying the order of songs as required by the asserted claims.

### d. The Accused Products and Services do not Provide "Data Packets" from a Server to a User Computer (All Claims) or Store "Data Packets" on the User Computer (Independent Claims 1, 26, 30–33)

The asserted claims all require that "data packets" be provided from a server to the UCA. As previously noted, we have interpreted the term "data packets" to mean "a group of at least two complete content items (e.g., audio, video, advertisements, or the like)."

It is undisputed that the Accused Rhapsody Products do not send "groups" of complete songs to the user computer. Rhapsody Radio web browser and Rhapsody-enabled mobile phone stream segments or parts of a song to the user on an as-needed basis. *Id.* ¶¶ 30, 40. Similarly, with the RAD/EA technology used by the Rhapsody PC client and home audio devices, the server only sends enough data to

create a 30–second segment of a song when the EA and RAD files are combined. *Id.* ¶¶ 34, 39. Likewise, RadioPass also streams songs from the server to the user one segment at a time, rather than as a complete song. *Id.* ¶ 43. Thus, there is no infringement because the accused products do not provide at least two "complete" songs or even one "complete" song.

Furthermore, there is also no infringement because the Accused Rhapsody Products do not store "data packets" on the UCA, as required by independent claims 1, 26, 30–33. Under our construction Order, these claims require that a "group of at least two complete content items ... be retained on the user's computer for instantaneous or later use."

As explained above with respect to sending of data packets, it is also undisputed that the accused products and services never provide a "group" of at least two complete or items to the user computer. As a result, there is never more than a portion of a single song on the user's computer at any one time. For this reason, the "storing" limitation is not infringed because the Accused Rhapsody Products and Services do not retain a group of at least two complete content items for instantaneous or later use.

Zamora contends that there is a question of fact "as to whether information associated with the songs (i.e., the artists' name, the songs title, informative material related to the song or artists) which is provided to the user as the songs are played as data packets that are stored on the user computer during the user's experience." Pl.'s Opp'n to Defs.' Mot. For Summ. J. at 11–12 [D.E. 207].[3] However, Defendants' non-infringement position is that it does not store "groups" of "at least two complete content items," and Zamora

never contends that "groups" of "informative material related to the song or artists" are stored on Rhapsody.

Similarly, Zamora's other factual dispute argument, that 30 seconds of buffering is equivalent to 3 minutes of buffering, is also irrelevant. The argument only relates to how long the songs are stored which has nothing to do with Defendants' argument concerning the number of songs that are stored.

Most of all, however, Plaintiff has failed to provide any evidence in support of the alleged factual disputes regarding the "storing" limitation. A party must rely upon credible evidence, such as affidavits and deposition testimony, in order to defeat summary judgment. *See* Fed. R.Civ.P. 56(e)(2). Here, Zamora cites no documents, no affidavits, no deposition testimony, and no expert testimony in support of its position. Thus, the unsupported "factual issues" related to storing identified by Zamora cannot defeat summary judgment.

Accordingly, Defendants are entitled to a judgment as a matter of law of no infringement for the reasons discussed above.

e. *The Accused Products and Services do not Have Rules Governing Utilization of the Data Packets (All Claims)*

Every asserted independent claim requires there to be, at the server or the user computer, "rules governing utilization of the data packets by the user computing arrangement and preventing a user from altering the rules." *See, e.g.,* '399 Patent, Claim 1, 7:39–41. Our Claim Construction Order defines the term phrase "rules gov-

**3.** It is important to note that the alleged "disputed questions of fact" addressed by us in this paragraph are the *only* particularly identified examples of such proffered by Plaintiff. As noted before, Defendants' Statement of Facts is largely uncontested by Plaintiff.

erning utilization" as "criteria that define the selecting, grouping, and using." Here, it is undisputed that the Rhapsody servers, and not the user computer, determine the songs to be sent to the user. *See* Defs.' Statement of Facts ¶¶ 28, 31, 36, 39–40, 43. Because the user computer does not select and group the songs, there are no rules that govern the "selecting, grouping, and using" of the "data packets" by the "user computing arrangement." Thus, Defendants are entitled to summary judgment of no infringement on this ground as well.

### f. No Single Entity Infringes All the Limitations in a Single Claim (All Claims).

Defendants contend that they are also entitled to summary judgment of no infringement on all claims because it is impossible for a single entity (such as Rhapsody) to perform all the steps in the asserted claims. Plaintiff fails to address this argument at all in its response.

■ In order to find direct infringement, a single party must perform or use each and every step of a claimed method or system. *See, e.g., BMC Resources, Inc. v. Paymentech, L.P.,* 498 F.3d 1373, 1378 (Fed.Cir.2007) ("[d]irect infringement requires a party to perform or use each and every step or element of a claimed method or system."). Here, all the asserted claims of the '399 Patent involve steps that occur at the user's computer and the server arrangement. Rhapsody services, however, do not provide a user computer or practice any of the steps at the server. As a result, there is no direct infringement by a single entity.

For the same reasons, there is no direct infringement of independent system claims 30–33. Each of these claims requires a user computing arrangement and a server. *See* '399 Patent 10:39–11:35. As stated above, no single entity provides both a server and a UCA for the Accused Rhap-

sody Products. Thus, there is no direct infringement of system claims 30–33.

■ Moreover, Defendants are also not liable for direct infringement under any "divided infringement" theory. If a third party carries out one or more steps of the claim on the defendant's behalf, the defendant can still be held liable if it controlled or directed the conduct of the acting third party. *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 1330 (Fed.Cir.2008) (The "control and direction" standard is satisfied "where the law would traditionally held the accused direct infringer vicariously liable for the acts committed by another party that are required to complete performance of a claimed method."). Moreover, "[m]aking information available to the third party, promoting the third party, instructing the third party, or facilitating or arranging for the third party's involvement in the alleged infringement is not sufficient." *Emtel, Inc. v. Lipidlabs, Inc.,* 583 F.Supp.2d 811, 839 (S.D.Tex. 2008); *Muniauction,* 532 F.3d at 1329–30. Here, it is undisputed that there is nothing akin to an agency relationship between Rhapsody and the Rhapsody users who provide and use the UCAs. Therefore, Defendants are entitled to summary judgment of no infringement on this basis as well.

### g. No Indirect Infringement (All Claims)

For similar reasons, summary judgment of no indirect infringement is also warranted. As shown below, there is no evidence that Defendants had the requisite intent required for a finding of indirect infringement, especially where it had no pre-suit knowledge of the '339 Patent.

■ To establish induced infringement under 35 U.S.C. § 271(b), Zamora must put forth evidence that Defendants knew of the '339 Patent. *DSU Medical Corp. v.*

*JMS Co., Ltd.*, 471 F.3d 1293, 1304 (Fed. Cir.2006) ("The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent") (citation omitted). Moreover, Zamora must also show "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *Id.* at 1306. Here, Zamora has offered no evidence that Defendants had any pre-suit knowledge of the '339 Patent. *See* Defs.' Statement of Facts ¶ 46. Similarly, Zamora has proffered no evidence that Rhapsody intended to encourage infringement by Defendants' customers or anyone else. *See id.* ¶¶ 26, 46. Accordingly, summary judgment of no induced infringement is warranted.

■ For similar reasons, Defendants are entitled to summary judgment of no contributory infringement under 35 U.S.C. § 271(c). "Contributory infringement liability arises when one 'sells within the United States ... a component of a patented machine ... knowing the same to be especially made or especially adopted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use.'" *Golden Blount, Inc. v. Robert H. Peterson Co.*, 365 F.3d 1054, 1061 (Fed.Cir. 2004). Here, Plaintiff proffered no evidence that Rhapsody knew about the '339 Patent before this case was filed, or intended to contribute to the infringement of the '339 Patent. Thus, Defendants are also entitled to summary judgment of no contributory infringement.

*h. The Accused Products and Services do no Infringe Under the Doctrine of Equivalents*

■ The doctrine of equivalents protects a patent owner against an accused infringer who appropriates the invention, but makes insubstantial changes to avoid literal infringement. As noted by the Supreme Court, the doctrine "has taken on a life of its own, unbounded by the patent claims." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 28, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). When applied too broadly, the doctrine interferes with the patent's public notice function by preventing competitors from determining what particular claims cover. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 732–34, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Due to these concerns, several principles limit the scope of equivalents to which a patent claim is entitled. The doctrine cannot be applied so broadly that it would: 1) capture subject matter surrendered during prosecution; 2) encompass prior art; or 3) vitiate a claim limitation. *K–2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366–68 (Fed.Cir.1999). Here, Defendants are entitled to summary judgment of no infringement under the doctrine of equivalents for several reasons.

■ First, Zamora has put forth no evidence regarding infringement under the doctrine of equivalents.

Second, a finding of equivalence would vitiate several claim limitations. The doctrine of equivalents cannot be used to read out limitations, nor can it encompass something that is the exact opposite of the claimed invention. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1346–47 (Fed.Cir.2001) ("the doctrine of equivalents cannot be employed in a manner what wholly vitiates a claim limitation"). Here, a finding of equivalence would vitiate several claim limitations, such as those requiring the transmission of groups of complete songs and rules governing the selection, grouping, and using of data packets by the UCA.

Indeed, Defendants proffer that the Accused Rhapsody Products use similar features as the prior art system that Mr. Williams distinguished from his invention. For example, Rhapsody sends pieces of a song to a user in a real-time during playback, similar to the streaming Internet radio systems in the prior art. Thus, it would be improper for the '339 Patent to cover similar functionality in the Accused Rhapsody Products under the doctrine of equivalents.

Finally, the prosecution history precludes a finding of infringement under the doctrine of equivalents. During prosecution, the inventor amended the claims by replacing language that permitted either the server or UCA to order the songs with language that allowed only the UCA to generate the "predetermined order." *See* Claim Construction Order at 15–16. Because the applicant narrowed the claims to gain allowance, Zamora may not now assert that the '399 Patent covers the Rhapsody systems where the server selects songs. *See, e.g., Festo Corp.*, 535 U.S. at 740, 122 S.Ct. 1831 ("[a] patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim"). Any holding to the contrary would permit Zamora to do exactly what the Patent and Trademark Office forbade-claim portions of the invention disclosed in the prior art.

For all of the above reasons, the Court grants Defendants' motion summary judgment of no infringement under the doctrine of equivalents.

## IV. CONCLUSION

Based upon a thorough review of the record as a whole and the arguments presented by the parties in their motions and at the hearing, it is hereby **ORDERED** that Defendants Realnetworks, Inc. and Rhapsody America LLC's Motion for Summary Judgment of Non–Infringement [D.E. 177] is **GRANTED** and a summary judgment is entered in favor of Defendants and against Plaintiff Zamora Radio LLC on Count I of the Complaint and Count I of Defendants' Counterclaim.